Philip LITLE, et al., Plaintiffs,

v.

ARAB BANK, PLC, Defendant/Third–Party Plaintiff,

v.

Bank Hapoalim et al., Third–Party Defendants.

Oran Almog, et al., Plaintiffs,

v.

Arab Bank, PLC, Defendant/Third–Party Plaintiff,

v.

Bank Hapoalim et al., Third–Party Defendants.

Gila Afriat–Kurtzer, et al., Plaintiffs,

v.

Arab Bank, PLC, Defendant/Third–Party Plaintiff,

v.

Bank Hapoalim et al., Third–Party Defendants.

Michael Bennett, et al., Plaintiffs,

v.

Arab Bank, PLC, Defendant/Third–Party Plaintiff,

v.

Bank Hapoalim et al., Third–Party Defendants.

Arnold Roth, et al., Plaintiffs,

v.

Arab Bank, PLC, Defendant/Third–Party Plaintiff,

v.

Bank Hapoalim et al., Third–Party Defendants.

Stewart Weiss, et al., Plaintiffs,

v.

Arab Bank, PLC, Defendant/Third–Party Plaintiff,

v.

**Bank Hapoalim et al., Third–
Party Defendants.**

**Jesner, et al., Plaintiffs,**

v.

**Arab Bank, PLC, Defendant/Third–
Party Plaintiff,**

v.

**Bank Hapoalim et al., Third–
Party Defendants.**

Nos. 04 CV 5449 (NG)(VVP), 04 CV 5564
(NG)(VVP), 05 CV 388 (NG)(VVP), 05
CV 3183 (NG)(VVP), 05 CV 3738
(NG)(VVP), 06 CV 1623 (NG)(VVP),
06 CV 3869 (NG)(VVP).

United States District Court,
E.D. New York.

April 3, 2009.

See also 507 F.Supp.2d 267.

Lee S. Shalov, James P. Bonner, Shalov Stone & Bonner LLP, New York, NY, Mark S. Werbner, Joel Lawrence Israel, Sayles Werbner, Dallas, TX, Richard D. Heideman, Tracy R. Kalik, Heideman Nudelman & Kalik PC, Washington, DC, for Plaintiffs.

Kevin Walsh, Steven J. Young, Dewey & Leboeuf LLP, New York, NY, for Defendants.

GERSHON, District Judge:

## BACKGROUND

Thousands of plaintiffs, consisting of both United States nationals and foreign nationals, bring claims for damages against defendant Arab Bank PLC for knowingly sponsoring suicide bombings and other murderous attacks on innocent civilians in Israel by providing banking and administrative services to various organizations identified by the United States government as terrorist organizations.[1] Each plaintiff alleges that he or she is a victim, or family member of a victim, of such attacks. Plaintiffs who are United States nationals seek recovery against Arab Bank pursuant to the Anti–Terrorism Act ("ATA"), 18 U.S.C. §§ 2332 *et seq.,* while foreign national plaintiffs, based upon similar factual allegations, allege violations of the law of nations and seek recovery against Arab Bank pursuant to the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.

With the exception of a single claim under the ATA, namely the claim under § 2339B(a)(2) alleging that Arab Bank failed to retain possession of or control over funds or report funds to the Secretary of the Treasury, Arab Bank's motion to dismiss the ATA claims and its motion to dismiss the ATS claims were denied on September 2, 2005, and on January 29, 2007. *See Almog v. Arab Bank,* 471 F.Supp.2d 257 (E.D.N.Y.2007); *Linde v. Arab Bank,* 384 F.Supp.2d 571 (E.D.N.Y. 2005). The court in *Linde* found that plaintiffs' allegations, based on Arab Bank's alleged financing of terrorism and provision of material support or resources to terrorists, were sufficient to state claims under the ATA. The court in *Almog* found that plaintiffs were entitled to seek recovery under the ATS for Arab Bank's violations of the law of nations because Arab Bank's alleged activities, if proven, amounted to aiding and abetting genocide, aiding and abetting crimes against humanity, and aiding and abetting suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population.

Arab Bank has now filed third party complaints that assert contribution claims against Israel Discount Bank of New York

---

1. These organizations include the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP").

("IDBNY") and three Israeli banks: Bank Hapoalim, B.M., Israel Discount Bank Ltd. ("IDB"); and Mercantile Discount Bank Ltd. ("Mercantile").[2] Arab Bank's position is that, to the extent that it is found liable to plaintiffs pursuant to the ATA and ATS, the third party defendant banks should contribute to any damages found against Arab Bank because these banks initiated or processed some funds transfers to or from various organizations that serve as "fronts" for terrorist organizations. With regard to the element of knowledge, Arab Bank simply alleges that, "if … Arab Bank … had knowledge or was willfully blind to the fact that transfers at issue were to *organizations acting as fronts* for any group adjudged to be a terrorist organization, then [third party defendants] had equal if not greater opportunity to have had such knowledge and therefore, upon information and belief, did have such knowledge." Third–Party Complaint, ¶ 116. The third party defendants now move to dismiss the third party complaints, arguing that no contribution rights exist under the ATA or ATS, that Arab Bank has failed to state a claim under the ATA or ATS, and that various other grounds support dismissal. Plaintiffs move to strike the third party complaints on the grounds that contribution is unavailable.

Arab Bank's allegations against the third party defendants—that they *initiated or processed funds transfers to or from* "front" organizations and had equal or greater opportunity than Arab Bank to know of the front organizations' affiliation with terrorist groups—are not the same as the allegations, taken as a whole, that plaintiffs assert against Arab Bank. As summarized in this court's opinion in *Almog*, 471 F.Supp.2d at 260–63, plaintiffs allege that, since the formation of Israel in 1948, Palestinian paramilitary and terrorist organizations have sought to destroy it through, *inter alia*, the systematic murder of Jews and other civilians in Israel. In December 1987, a collective Palestinian uprising, or *intifada*, erupted against Israel in the West Bank and in Gaza. In late September 2000, a second Palestinian *intifada*, or AI Aqsa Intifada or Intifada AI Quds (the "Second Intifada"), erupted after the collapse of peace negotiations between the State of Israel and the Palestinian Authority. Each *intifada* was characterized by systematic and widespread terror campaigns designed to kill Jews and Israelis, as well as to coerce the civilian population of Israel to cause Israel to cede territory to the Palestinians and ultimately to destroy the Jewish state. With the outbreak of the Second Intifada, several terrorist organizations intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks in Israel, the West Bank, and the Gaza Strip, resulting in the death and injury of thousands of individuals, the majority of which were innocent civilians.

**2.** Arab Bank also asserts that it intends to pursue contribution claims against various unidentified banks. In a section entitled "ABC Banks 1–20," Arab Bank's third party complaint alleges that "[u]pon information and belief, other banks, located in Israel and in other countries, also initiated, processed or otherwise participated in the transactions at issue," Third Party Complaint, ¶ 52, and that "Arab Bank anticipates that such banks may be named in the future and served in accordance with applicable rules of procedure, or as the Court may otherwise direct." Third Party Complaint, ¶ 55.

The third party complaints that Arab Bank has filed in these seven related cases are similar, but not identical. For ease of reference, citations to specific paragraphs of the third party complaint, unless otherwise noted, refer to the third party complaint filed on June 6, 2007 in *Litle et al. v. Arab Bank, PLC*, No. 04–CV–5449.

Plaintiffs identify the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") (collectively "the terrorist organizations") as prominent terrorist organizations in the Second Intifada, operating in Palestinian-controlled territory and acting with the united purpose of eradicating the State of Israel through a campaign of terror, genocide, and crimes against humanity. HAMAS was named a Specially Designated Terrorist entity ("SDT") by the U.S. government in 1995 and designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State in 1997. The PIJ was named as an SDT in 1995 and designated an FTO by the U.S. Secretary of State in 1997. The PFLP was named an SDT in 1995 and an FTO in 1997. Finally, HAMAS, the PIJ, and the AAMB were each designated a Specially Designated Global Terrorist Entity ("SDGT"). Plaintiffs allege that these terrorist organizations openly adhere to a shared mission, "to topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestine state," The terrorist organizations seek to accomplish their shared goal by cooperating in the planning and commission of suicide bombings and other murderous attacks and by providing financial support to the relatives of "martyrs" and those injured in or imprisoned for perpetrating attacks. This has resulted in the systematic and continuous killing and injury of thousands of unarmed innocent civilians in Israel, the West Bank, and the Gaza Strip.

Plaintiffs allege that several purported charitable organizations, including the Popular Committee for Support of the Intifada (the "Popular Committee"), the Coalition of Benevolence (the "Coalition"), the Humanitarian Relief Association (the "HRA"), the Al-Ansar Society, and the Tulkarem Charitable Committee, are in fact front organizations for the terrorist organizations and acted as fund-raising apparatuses that raised and laundered funds to subsidize the Second Intifada and to bankroll the terrorist organizations. Plaintiffs allege that two specific committees were created in Saudi Arabia to raise funds to aid in the proliferation of the objectives of HAMAS, the PIJ, the AAMB, and the PFLP: (1) the Popular Committee for Assisting the Palestinian Mujahideen (the "Mujahideen Committee"); and (2) in 2002, the Saudi Committee for Aid to the Al-Quds Intifada (the "Saudi Committee"). These two organizations set up accounts labeled "Account 98" accounts at various banks in Saudi Arabia, including the Arab National Bank (of which defendant Arab Bank owns a 40% interest), to raise funds for the families of "martyrs" of HAMAS, the AAMB, the PIJ, and the PFLP. In addition, public and private donations were deposited in numerous accounts established in various financial institutions in the Middle East, primary among them Arab Bank, for the explicit purpose of providing funds to families of "martyrs" of HAMAS, the PIJ, the AAMB, and the PFLP.

Plaintiffs allege that Arab Bank "knowingly and intentionally, both directly and indirectly, aided and abetted and intentionally facilitated the attacks by HAMAS, the PIJ, the AAMB, and the PFLP by soliciting, collecting, transmitting, disbursing and providing the financial resources that allowed those organizations to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Israeli presence from the Middle East landscape." According to plaintiffs, Arab Bank is one of the largest financial institutions in the Middle East and is headquartered in Jordan. It

operates through various sister institutions, subsidiaries, and affiliates, which collectively make up the Arab Bank Group. To this end, Arab Bank owns a 40% interest in Saudi Arabia's Arab National Bank. Arab Bank has over 400 branch offices in over twenty-five countries, including branches located in Jordan, Saudi Arabia, the West Bank, the Gaza Strip, and the United States. Its U.S. branch, located in New York, provides financial services that include clearing and correspondent banking services to its foreign bank branches, affiliated banking institutions (those that are owned or controlled by Arab Bank Group), and other foreign banks.

Plaintiffs allege that Arab Bank was part of a formalized system of financing that HAMAS, the PIJ, the AAMB, and the PFLP rely upon to plan, fund, and carry out the suicide bombings and other murderous attacks. Specifically, plaintiffs allege that Arab Bank materially supported the efforts and goals of the terrorist organizations in two ways. First, Arab Bank provided banking services, including maintaining accounts, for HAMAS and other terrorist organizations. With respect to HAMAS specifically, plaintiffs allege that Arab Bank provided banking services to HAMAS directly by collecting funds into HAMAS accounts in its Beirut, Lebanon and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch and because there were various advertisements publicized throughout the Middle East calling for donations to Arab Bank accounts. Arab Bank knew that the donations were being collected for terrorist attacks.

Plaintiffs also allege that Arab Bank maintained accounts and solicited and collected funds for the various charitable organizations, including the Popular Committee, organizations that are part of the Coalition, the HRA, the Al–Ansar Society and the Tulkarem Charitable Committee, all of which it knew are affiliated with the various terrorist organizations. In addition, plaintiffs allege that Arab Bank maintained accounts for individual supporters of terrorist organizations, such as HAMAS and al Qaeda. Arab Bank knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. Finally, Arab Bank laundered funds for the terrorist and front organizations, including the Holy Land Foundation for Relief and Development ("HLF"), which raised funds for HAMAS in the United States.

Plaintiffs additionally allege that Arab Bank administered the financial infrastructure by which the Saudi Committee distributed a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks. Despite its knowledge that the Saudi Committee was distributing this benefit to families of "martyrs," Arab Bank essentially served as a "paymaster" through its branch offices within the West Bank and the Gaza Strip. Plaintiffs allege that the Saudi Committee, as of November 2001, had paid millions of dollars to suicide bombers or their beneficiaries through Arab Bank. Additionally, Arab Bank has transmitted millions of dollars to, among others, various institutions and individuals on behalf of the Saudi Committee.

According to plaintiffs' allegations, Arab Bank played an integral role in the structured financial process by which the funds in the "Account 98" accounts were transferred to their intended beneficiaries. The first step was to create and maintain a

database of persons eligible to receive payments. To accomplish that, the Saudi Committee prepared a list of potential beneficiaries, including the families of "martyrs" and of prisoners. After verifying the names of the beneficiaries, their contact information, and their injury with Palestinian officials, the Saudi Committee coordinated with Arab Bank. Specifically, the Saudi Committee consulted with Arab Bank and local representatives of HAMAS to finalize the lists of beneficiaries.

The next step, as alleged by plaintiffs, was to transfer the funds contained in the "Account 98" accounts in the various banks to accounts at Arab Bank for the beneficiaries. The Saudi Committee opened an account at Arab Bank in the beneficiary's name and deposited a standard amount of U.S. dollars or Saudi Riyals into the account. Because Saudi Riyals cannot be conveniently converted to Israeli currency, Arab Bank facilitated that conversion by routing those funds through its New York branch, where they were converted to U.S. dollars and then to Israeli currency. Thus, "Account 98" funds "often, if not always," went through Arab Bank's branch in New York before being transferred to accounts in the Middle East.

Plaintiffs allege that, after the funds were transferred to designated accounts in the Arab Bank branches in the West Bank and the Gaza Strip, Arab Bank distributed the money to beneficiaries with appropriate documentation. To ensure that only families of bona fide "martyrs" received disbursements, the Saudi Committee required beneficiaries to present registration cards to Arab Bank to receive remittances. The registration card was an official certification from the Palestinian Authority establishing the bona fides of the "martyr."

Arab Bank allegedly provided instructions to the general public on how to qualify and collect money. Thus, plaintiffs claim that Arab Bank not only disbursed the funds to the beneficiaries, but also participated in the formalized process that required the families of "martyrs" to obtain official certification of their deceased relatives' status as bona fide "martyrs."

According to plaintiffs, the Saudi Committee paid and transmitted benefits to approximately 200 fallen "martyrs" through the program administered by Arab Bank in the first year of its existence alone. They also allege that the Saudi Committee openly declared that its funds were transmitted and distributed to the families of "martyrs" through Arab Bank. Plaintiffs allege that there is a direct correlation between the number of attacks, including suicide bombings, and the amount of funds held by the Mujahideen and Saudi Committees. Plaintiffs allege that the payment and promise of payment to families of "martyrs" incentivized and encouraged potential suicide bombers. Thus, plaintiffs allege that Arab Bank facilitated and provided an incentive for the suicide bombings and other murderous attacks in that the individual attackers knew that, if they committed an attack, their families would be supported by the funds held in their names by Arab Bank.

As is apparent from the above summary, the third party defendants' alleged misconduct—initiating and/or processing funds transfers to or from "front" organizations while, on information and belief, having equal or greater opportunity than Arab Bank to know of the front organizations' affiliation with terrorist groups—is not the same as Arab Bank's alleged misconduct.[3]

---

**3.** Arab Bank argues that "[t]his Court has already held that claims may be asserted pursuant to the ATS against a financial institu-

tion for performing financial services," Brief of Arab Bank at 30–31, and that plaintiffs seek to hold Arab Bank liable simply for process-

Arab Bank does not identify any basis for finding a violation of an international norm so as to give rise to liability under the ATS. Nor does it identify any particular section of the ATA and show how the alleged conduct of the third party defendants violates the section. It merely makes the briefest mention of the ATA and ATS as the bases for its claims. The court, however, does not reach the issue of whether Arab Bank's allegations would be sufficient to state a claim under the ATA or ATS because, simply put, Arab Bank has no right of contribution under either statute.

## DISCUSSION

In the absence of any statutory right of contribution present in the ATA or the ATS, Arab Bank invites the court to imply a right of contribution or to create one under federal common law.

## I. Whether There Is a Right of Contribution Under the ATA

Where a statute, such as the ATA, creates an express right of action, the Supreme Court has determined that a right to contribution may arise in either of two ways: "first, through the affirmative creation of a right of action by Congress, either expressly or by clear implication; or, second, through the power of the federal courts to fashion a federal common law of contribution." *Texas Industries Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 638, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL–CIO,* 451 U.S. 77, 90–91, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981). Applying this analysis in *Northwest Airlines,* the Supreme

Court held that no right of contribution exists under Title VII, 42 U.S.C. § 2000e *et seq.,* and the Equal Pay Act, 29 U.S.C. § 206. *Northwest Airlines,* 451 U.S. at 90–91, 101 S.Ct. 1571. The defendant airline in *Northwest Airlines* was found liable for violating Title VII and the Equal Pay Act because it unlawfully paid its female employees lower wages than it paid its male employees. *Id.* at 80–81, 101 S.Ct. 1571. After judgment was entered against it, the defendant airline alleged that the employees' union had caused and/or contributed to the discrimination because the employees' wage amounts were based on the terms of a collective bargaining agreement that the union had negotiated with the airline on behalf of both female and male employees. *Id.* at 81–82, 101 S.Ct. 1571. Even though the union allegedly had been involved in setting the discriminatory wage terms for which the airline was found liable, the Supreme Court held that the defendant airline was not entitled to assert a contribution claim against the union. Because neither the statutes nor their legislative histories indicated express or implied Congressional intent to create a right of contribution, and because there was no basis to create such a right under federal common law, the Court was without power to recognize the airline's contribution claim. *Id.* at 91, 94–95, 98, 101 S.Ct. 1571. For the same reasons, the Supreme Court in *Texas Industries* found that no right of contribution exists under the Sherman Act or the Clayton Act. *Texas Industries,* 451 U.S. at 639–40, 647, 101 S.Ct. 2061. *See also Herman v. RSR Sec. Serv. Ltd.,* 172 F.3d 132, 143–44 (2d Cir. 1999) (finding no contribution rights under the Fair Labor Standards Act); *Getty Petroleum Corp. v. Island Transp. Corp.,* 862

---

ing wire transfers for charitable organizations that may or may not have ultimately benefited a terrorist organization. *Id.* at 7–8. As is apparent from the text, these arguments involve mischaracterizations that ignore the totality of plaintiffs' allegations against Arab Bank, as well as the prior decisions of this court.

F.2d 10, 16 (2d Cir.1988) (finding no contribution rights under the Lanham Act).

Although *Texas Industries* and *Northwest Airlines* analyze contribution rights under statutes other than the ATA, they set forth the general standard for determining whether contribution rights exist where Congress has created an express right of action. In *Musick, Peeler & Garrett v. Employers Insurance of Wausau,* 508 U.S. 286, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993), a case heavily relied upon by Arab Bank, the Supreme Court instructed that courts should engage in a different analysis when determining whether contribution rights exist under an *implied* cause of action such as arises under Section 10b of the 1934 Securities Act, 15 U.S.C. § 78j, and Rule 10b–5 of the Securities and Exchange Commission. *Id.* at 290–291, 113 S.Ct. 2085. "The private right of action under Rule 10b–5 was implied by the Judiciary on the theory that courts should recognize private remedies to supplement federal statutory duties, not on the theory that Congress had given an unequivocal direction to the courts to do so." *Id.* at 291, 113 S.Ct. 2085. Accordingly, the Court in *Musick* noted that "it would be futile to ask whether the 1934 Congress also displayed a clear intent to create a contribution right collateral to the remedy." *Id.* Instead, the Supreme Court examined how Congress would have addressed the issue of contribution rights had the 10b–5 action been included as an express provision in the 1934 Act. Finding it significant that several similar provisions of the 1934 Act expressly provided for contribution rights, the Court concluded that Congress would have expressly provided for contribution rights had the right of action under Rule 10b–5 been included as an express provision in the 1934 Act. *Musick,* 508 U.S. at 297, 113 S.Ct. 2085 ("We think that these explicit provisions for contribution are an important, not an

inconsequential, feature of the federal securities law and that consistency requires us to adopt a like contribution rule for the right of action existing under Rule 10b–5"). Because the ATA, unlike the statute at issue in *Musick,* provides an express right of action, the court applies the analysis set forth in *Texas Industries* and *Northwest Airlines,* rather than the *Musick* analysis, to determine whether contribution rights exist under the ATA.

### A. Whether Congress Created Contribution Rights by Clear Implication

As Arab Bank acknowledges, the ATA does not expressly create a right of contribution on behalf of those accused of violating its provisions. The text of the ATA provides that:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. § 2333. The issue is whether Congress created a right of contribution under the ATA by "clear implication." *Texas Industries,* 451 U.S. at 638, 101 S.Ct. 2061.

■■■ When determining whether Congress intended "by clear implication" to create a right of contribution under a federal statute, courts must analyze the language of the statute itself, the identity of the statute's intended beneficiaries, the statute's legislative history, and the underlying purpose and structure of the statutory scheme. *Northwest Airlines,* 451 U.S. at 91, 101 S.Ct. 1571; *Texas Industries,*

451 U.S. at 639, 101 S.Ct. 2061. Applying this framework to the present case, it is clear that the ATA was enacted to benefit the victims of terrorism, not terrorists or those who aid and abet them. Indeed, implying a right of contribution would not necessarily further the statutory purpose of compensating victims of terrorism. Plaintiffs, should they prevail, are entitled to full recovery from Arab Bank, and adding a right of contribution would add to the expense of their litigation. *See Anderson v. Griffin,* 397 F.3d 515, 523 (7th Cir.2005) ("[A]ll that a right of contribution does is add to the costs of litigation, and so unless there is a compelling reason to suppose that the legislature would want such a right to be enforced, ... it will not be").

Arab Bank argues that, if a defendant were required to be part of the class for whose benefit the statute was intended, then no defendant would ever be entitled to contribution rights, which is plainly inconsistent with the Supreme Court's holding in *Musick.* The statute at issue in *Musick,* though, the Securities and Exchange Act of 1934, *did* provide expressly for contribution rights in some of its sections. Unlike the statute at issue in *Musick,* the ATA includes no provisions meant to benefit defendants.

The ATA provides criminal as well as civil remedies and treble damages, and the existence of such comprehensive statutory remedies "strongly evidences an intent not to authorize additional remedies." *Northwest Airlines,* 451 U.S. at 93–94, 101 S.Ct.

1571; *see Texas Industries,* 451 U.S. at 639, 101 S.Ct. 2061. The availability of statutory treble damages in *Texas Industries* was particularly significant to the Supreme Court's decision not to imply a right of contribution under the Clayton Act and the Sherman Act.[4] "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Texas Industries,* 451 U.S. at 639, 101 S.Ct. 2061. The Supreme Court went so far as to say that "[t]he absence of any reference to contribution in the legislative history or of any possibility that Congress was concerned with softening the blow on joint wrongdoers in this setting makes examination of other factors unnecessary." *Id.* As with the statutes at issue in *Texas Industries,* the ATA explicitly provides for treble damages, and the ATA's legislative history neither addresses the issue of contribution nor indicates in any way that Congress was concerned with the welfare of those who intentionally violate the ATA's provisions.

### i. References to *Klinghoffer* in the ATA's legislative history

Arab Bank argues that Congress intended to create contribution rights under the ATA based upon several statements in the ATA's legislative history about *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 739 F.Supp. 854 (S.D.N.Y.1990), *vacated,* 937 F.2d 44 (2d Cir.1991) (vacating and remanding for fur-

---

4. Section 4 of the Clayton Act, 15 U.S.C. § 15, provides:

[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him

sustained, and the cost of suit, including a reasonable attorney's fee.

Treble damages were available under both the Clayton Act and the Sherman Act because the phrase "antitrust laws," as used in the statutory provision above, included both the Sherman Act, 15 U.S.C. § 1, and the Clayton Act. *Texas Industries,* 451 U.S. at 633 n. 3, 101 S.Ct. 2061, *citing* 15 U.S.C. § 12(a).

ther determinations about personal jurisdiction and service of process without questioning the district court's findings about subject matter jurisdiction). The factual and procedural background of the *Klinghoffer* case illustrate why Arab Bank's argument is unpersuasive.

The *Klinghoffer* plaintiffs—who were traveling in the Mediterranean Sea when their ship was forcibly seized by the Palestine Liberation Organization ("PLO")—sued the owner and charterer of the ship, travel agencies, and various other entities, claiming that these defendants failed to take sufficient steps to prevent or warn of the dangers of piracy. Subject matter jurisdiction in *Klinghoffer* was based on admiralty law, one of the few areas of law in which the Supreme Court has allowed contribution claims to proceed. *See Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 110–11, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974). Accordingly, it was unsurprising that the defendants sought contribution from the PLO, and equally unsurprising that the PLO chose not to argue in its motion to dismiss that contribution was unavailable. Unlike *Klinghoffer,* however, the present case does not involve admiralty law, and the Supreme Court has made clear that its decision to recognize contribution rights under admiralty law should *not* be interpreted as a general federal common law rule allowing contribution. *See Texas Industries,* 451 U.S. at 642, 101 S.Ct. 2061 ("*Cooper Stevedoring* thus does not stand for a general federal common-law right of contribution"); *Northwest Airlines,* 451 U.S. at 96–97, 101 S.Ct. 1571.

Although several statements in the ATA's legislative history indicate a desire to expand upon the *Klinghoffer* opinion and extend federal jurisdiction to hear the claims of U.S. nationals injured in land-based terrorist attacks, these statements do not indicate Congressional intent to create rights on behalf of those who intentionally violate the ATA, For example, one of the statements upon which Arab Bank primarily relies provides:

> Building on the *Klinghoffer* litigation, Congress and the State Department wanted through Section 2333(a) to ensure that torts from terrorist activity would be actionable *even if they occurred on land* in a foreign country: "This bill ... expands the *Klinghoffer* opinion. Whereas that opinion rested on the special nature of our admiralty laws, this bill will provide *general jurisdiction* to our Federal courts and a cause of action for cases in which an American has been injured by an act of terrorism overseas...."

Brief of Arab Bank at 22 (*quoting* the U.S. Amicus Br. filed in *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.,* 291 F.3d 1000 (7th Cir.2002) (*quoting Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Cts. and Admin. Practice, Senate Committee on the Judiciary,* 101st Cong. 2d Sess. 12) (1990) (statement of Alan J. Kreczko, Deputy Legal Advisor, Dept. of State)) (emphases altered).

That *Klinghoffer* rested on admiralty jurisdiction and that Congress wanted to give rights to land-based terrorist victims under the ATA does not mean that Congress intended to import all of admiralty law into the ATA. Put another way, although statements quoted by Arab Bank indicate Congressional intent to provide terrorist *victims* a remedy for their injuries, regardless of whether they were attacked on land or water, these statements do not indicate an intent to create a right of recovery on behalf of the alleged terrorists and their aiders and abettors.

For a contribution claim to arise by implication, there must be a "*clear* implication" that Congress intended to create

such a right. *See Texas Industries*, 451 U.S. at 638, 101 S.Ct. 2061 (emphasis added). The congressional statements about expanding the *Klinghoffer* decision simply do not support such an implication.

### ii. Other statements made during ATA Congressional hearings

Arab Bank offers three other quotations from the ATA's legislative history, two of which were not made by legislators and none of which directly addresses the issue of contribution, to support its argument that Congress intended by "clear implication" to create a right to contribution under the ATA:

> [T]he bill as drafted is powerfully broad, and its intention ... is to bring focus on the problem of terrorism and, reaching beyond terrorist actors to those who fund and guide and harbor them, [to] bring all of the substantive law of the American tort system.... *Let us make all the tort law in the country available* to see what we can do to sort out these suits, *all the doctrines of vicarious and shared liability, joint and several liability, and so forth,* and let us see if we can't nail all the tortfeasors down the chain, from the person who starts spending money to the person [who] actually pulls the trigger. [Antiterrorist Act of 1990: Hearing before the Subcomm. On Cts. And Admin. Practice, Senate Comm. On the Judiciary, 101st Cong. 2d Sess., at 12 (1990) ("ATA Hearing") at 136–37 (testimony of Daniel Pipes, Foreign Policy Research Inst.) ] [*sic* ] [5]

> The substance of such action is not, and need not be, defined by the statute, for the fact—patterns that may give rise to such suits may be *as varied and numerous as those found in the law of torts,* and it is essentially to the well-developed American State and Federal body of common law and statutory law that this bill opens the door. [ATA Hearing at 86 (statement of Joseph A. Morris, Pres. And Gen. Counsel of the Lincoln Legal Found.) (emphasis supplied) ]

> The substance of ... an action [under Section 2333] is not defined by the statute, because the fact patterns giving rise to such suits will be *as varied and numerous as those found in the law of torts.* [S.Rep. No. 102–342 at 47 (1992), U.S.Code Cong. & Admin.News 1992 at 3921 (emphasis supplied).]

Brief of Arab Bank at 19. In addition to these statements, Arab Bank relies on this court's previous statement that Section 2333 of the ATA was meant to incorporate "background tort principles" in order to advance its goal of "cutting off the flow of money to terrorists at every point along the chain of causation." *Linde,* 384 F.Supp.2d at 583.

As a preliminary matter, the first two statements from the ATA's legislative history upon which Arab Bank relies were made by individuals testifying before Congress, not members of Congress. Second, even if members of Congress had made the statements, these statements do not suggest an intent, by clear implication, to create a right of contribution on behalf of a defendant accused of intentionally violating the ATA. Neither this court's previous rulings, nor statements in the ATA's legislative history, about importing general principles of tort liability support creating a right of contribution. In the early 1990's, the timeframe during which Congress passed the ATA, general principles of tort liability, although they supported joint and several liability, did *not* support a right of

---

**5.** Although Arab Bank's brief identifies Daniel Pipes as the person who provided this testimony, the transcript of the hearing identifies Joseph Morris as the originator of these statements.

contribution for *intentional* wrongdoers. *See* Restatement (Second) of Torts (1979) § 886A. The Court in *Texas Industries* drew an explicit distinction between contribution and joint and several liability: "[T]he judicial determination that defendants should be jointly and severally liable [does not] suggest that courts also may order contribution, since joint and several liability simply ensures that the plaintiffs will be able to recover the full amount of damages from some, if not all, participants." *Texas Industries*, 451 U.S. at 646, 101 S.Ct. 2061. "The course of tort law in this century has been to reverse the old rule against contribution, but this movement has been confined in large part to actions in *negligence*," *Musick*, 508 U.S. at 297, 113 S.Ct. 2085 (emphasis added), and many jurisdictions in this country still do not recognize contribution rights for *intentional* tortfeasors.[6] *See* Restatement (Third) of Torts (2000) § 23, Comment *l*. Nothing in the ATA's legislative history indicates that Congress contemplated softening the blow of judgment on those who intentionally violate the ATA.

As Senator Grassley explained when introducing Section 2333 in 1991, the purpose of the ATA is that it: "removes the jurisdictional hurdles in the courts confronting *victims* and it empowers *victims* with all the weapons available in civil litigation ... The [ATA] accords *victims* of terrorism the remedies of American tort law." 137 Cong. Rec. S4511 (Apr. 16, 1991) (statement of Sen. Grassley) (emphases added). Congress carefully considered which parties should be able to recover damages under the ATA, specifically

defining the class of potential plaintiffs to include a victim's estate, survivors and heirs, *see Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Cts. and Admin. Practice, Senate Committee on the Judiciary*, 101st Cong. 2d Sess. 46 (1990), and discussing whether to adopt a provision that would provide the United States a right to sue on behalf of terrorist victims. *See id.* at 51.[7] Furthermore, the third statement from the ATA's legislative history upon which Arab Bank relies—"[t]he substance of ... an action [under Section 2333] is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts"—is immediately followed by a statement which provides that: "This bill opens the courthouse door to *victims* of international terrorism." 102 S. Rpt. 342 (1992) (emphasis added). Nowhere in the ATA's legislative history did Congress consider whether a defendant who intentionally violates the ATA should be entitled to recover damages from other entities.

Based on the legislative history, as well as the other factors relevant to this inquiry—the statute's structure and intended beneficiaries and the existence of treble damages and other remedies—I find that Congress did not create a right of contribution under the ATA by clear implication.

**B. Whether this Court Should Create a Common Law Contribution Claim Under the ATA**

■ Where Congress neither expressly nor implicitly intends to create a right of

---

6. The Restatement (Second) of Torts (1979), which was in effect at the time that Congress created the ATA, provides that "[t]here is no right of contribution in favor of any tortfeasor who has intentionally caused harm." Although the Restatement (Third) of Torts (2000) no longer includes this *per se* prohibi-

tion, many jurisdictions, as noted above, continue to prohibit contribution rights on behalf of intentional tortfeasors.

7. Although the issue of providing such a right to the United States was debated before Congress, no such provision was enacted.

contribution, a contribution right, if one exists at all, can arise only from federal common law. *Texas Industries,* 451 U.S. at 640, 101 S.Ct. 2061. "In areas where federal common law applies," such as interstate and international disputes implicating our relations with foreign nations, "the creation of a right to contribution *may* fall within the power of the federal courts." *Texas Industries,* 451 U.S. at 641, 101 S.Ct. 2061 (emphasis added). However, "[t]here is, of course, 'no federal general common law,'" and a court's authority to formulate new causes of action pursuant to the common law arises only in narrowly drawn circumstances. *Texas Industries,* 451 U.S. at 640, 101 S.Ct. 2061, *quoting Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). These circumstances "fall into essentially two categories: those in which a federal rule of decision is 'necessary to protect uniquely federal interests,' and those in which Congress has given the courts the power to develop substantive law." *Texas Industries,* 451 U.S. at 640, 101 S.Ct. 2061 (some internal citations omitted), *quoting Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 426, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). This case falls under neither category.

■ Unlike ERISA, an area in which "[t]he Supreme Court has left no doubt that 'courts are to develop a federal common law of rights and obligations under ERISA-regulated plans,'" *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 16 (2d Cir.1991) (some internal quotation marks omitted), *quoting Firestone Tire and Rubber Co. v. Bruch,*

489 U.S. 101, 110, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also In re Masters Mates & Pilots Pension Plan and IRAP Litigation,* 957 F.2d 1020, 1027 (2d Cir. 1992), Congress did not empower courts to create common law contribution rights under the ATA. The Supreme Court in *Texas Industries* lacked the power to create a right of contribution under federal common law even though:

> Congress ... did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common-law tradition. *Texas Industries,* 451 U.S. at 643, 101 S.Ct. 2061, *quoting Nat'l Soc. of Prof. Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Noting that "[i]t does not necessarily follow ... that Congress intended to give courts as wide discretion in formulating remedies to enforce the provisions of the Sherman Act or the kind of relief sought through contribution," 451 U.S. at 643–644, 101 S.Ct. 2061, the Court held that it did not have federal common law power to create a right of contribution under the Sherman Act.[8] Likewise, that "[t]he substance of ... an action [under the ATA] is not defined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts," S.Rep. No. 102–342, at 47 (1992), does not empower courts to create a federal common law right of contribution.

---

8. Although courts are expected to draw on common law traditions when defining the substance of a violation under the Sherman Act, Congress did not grant courts common law jurisdiction over Sherman Act violations: "'It is very true that we use common-law terms here and common-law definitions in order to define an offense which is in itself comparatively new, *but it is not a common-law jurisdiction that we are conferring upon the circuit courts of the United States,'"* Texas Industries,* 451 U.S. at 644, 101 S.Ct. 2061, *quoting* 21 Cong. Rec. 3149 (1890) (emphasis included in *Texas Industries* ).

Nor does the ATA, although it unquestionably deals with an important issue of federal law, fall within the category of cases where a federal rule of decision is necessary to protect uniquely federal interests. The authority to create federal common law to protect uniquely federal interests "exists only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of States or our relations with foreign nations, and admiralty cases." *Texas Industries*, 451 U.S. at 640–41, 101 S.Ct. 2061. A private suit brought by private parties pursuant to a federal statute does not, without more, implicate uniquely federal interests. In *Texas Industries* the Supreme Court explained why a private suit brought under federal statutes—the Sherman Act and Clayton Act—did not implicate issues of uniquely federal concern:

> [A] treble-damages action remains a private suit involving the rights and obligations of private parties. Admittedly, there is a federal interest in the sense that vindication of rights arising out of these congressional enactments supplements federal enforcement and fulfills the objects of the statutory scheme. Notwithstanding that nexus, contribution among antitrust wrongdoers does not involve the duties of the Federal Government, the distribution of powers in our federal system, or matters necessarily subject to federal control even in the absence of statutory authority. In short, contribution does not implicate "uniquely federal interests" of the kind that oblige courts to formulate federal common law.

*Texas Industries*, 451 U.S. at 642, 101 S.Ct. 2061 (some internal citations omitted). In contrast, the Supreme Court has instructed that international disputes that implicate our country's foreign relations—such as disputes that implicate the common law "act of state" doctrine—impact upon "uniquely federal" interests and should be governed by federal law rather than state law. *Banco Nacional*, 376 U.S. at 421–424, 84 S.Ct. 923. Unlike *Banco Nacional*, the issue in this case is not whether to apply federal or state law when analyzing a common law doctrine; the issue is whether, in the presence of a statute that provides explicit remedies, this court has the authority to formulate an additional common law right of contribution on behalf of defendant.

Furthermore, the sort of international disputes that implicate our country's foreign relations, as discussed in *Banco Nacional*, typically involve disputes in which foreign governments and their officials are parties to the litigation. *Banco Nacional*, 376 U.S. at 425, 432, 84 S.Ct. 923. When Congress considered the ATA's potential impact on foreign relations, discussion revolved primarily around the issues that would arise if the ATA were used to sue a foreign government or official. The ATA provides that "no action shall be maintained under [the ATA] against .... a foreign state ... or an officer ... or an agency thereof acting within his or her official capacity or under color of legal authority." 18 U.S.C. § 2337. Representatives of the U.S. State Department and Department of Justice suggested that 18 U.S.C. § 2337 be amended because it would be inappropriate for U.S. courts to judge whether a foreign state or official had acted outside or within its "official capacity." *Antiterrorism Act of 1990: Hearing on S. 2465 Before the Subcomm. on Cts. and Admin. Practice, Senate Committee on the Judiciary*, 101st Cong. 2d Sess. 21–23, 37–38, 55 (1990). Congress declined to adopt such an amendment, however, and the legislative history contains no expressions of apprehension or concern about the foreign relations impli-

cations of using the ATA to sue terrorist organizations and the nongovernmental entities who aid and abet them. Indeed, the ATA was enacted to provide a remedy against these organizations.

Even assuming that this court had *power* to fashion a new common law claim for contribution, this does not mean that the court must or should create such a claim. *Texas Industries*, 451 U.S. at 641, 101 S.Ct. 2061 ("In areas where federal common law applies, the creation of a right to contribution *may* fall within the power of the federal courts") (emphasis added). As discussed earlier, although "[t]he course of tort law in this century has been to reverse the old rule against contribution ... this movement has been confined in large part to actions in *negligence* " *Musick*, 508 U.S. at 297, 113 S.Ct. 2085 (emphasis added), and many jurisdictions in this country still do not recognize contribution rights for *intentional* tortfeasors.[9] *See* Discussion *supra* Part I.A.ii. The existence of competing policy views about whether or not contribution claims serve the interests of fairness, efficiency, and deterrence under the ATA cuts against judicial action and suggests that the legislative branch is best suited to determine the availability of contribution. *Texas Industries*, 451 U.S. at 646–647, 101 S.Ct. 2061. Although proponents of contribution might argue that it is fair to allow Arab Bank to seek contribution if the third party defendants are partly responsible for plaintiffs' injuries, "traditional equitable standards have something to say about the septic state of

the hands of such a [defendant] in the courts." *Id.* at 635, 101 S.Ct. 2061. Furthermore, although it is possible that recognizing a right of contribution under the ATA would better serve the ATA's purpose of deterring terrorism because it would require all who violate the law to pay the consequences, "an even stronger deterrent may exist in the possibility, even if more remote, that a single participant could be held fully liable for the total amount of the judgment. In this view, each prospective [wrongdoer] would ponder long and hard before engaging in what may be called a game of 'Russian roulette.' " *Texas Industries*, 451 U.S. at 636–637, 101 S.Ct. 2061. In sum, "[t]he range of factors to be weighed in deciding whether a right to contribution should exist demonstrates the inappropriateness of judicial resolution of this complex issue. Ascertaining what is 'fair' in this setting calls for inquiry into the entire spectrum of [the area of law at issue], not simply the elements of a particular case or category of cases." *Id.* at 646–47, 101 S.Ct. 2061. "Similarly whether contribution would strengthen or weaken enforcement of the ... laws, or what form a right of contribution should take, cannot be resolved without going beyond the record of a single lawsuit." *Id.* at 647, 101 S.Ct. 2061. Accordingly, "regardless of the merits of the conflicting arguments, this is a matter for Congress, not the courts, to resolve." *Id.* at 646, 101 S.Ct. 2061.

For the reasons stated above, the court finds that Congress did not indicate, either

9. When deciding whether to recognize contribution rights under ERISA, the Second Circuit in *Chemung* and *In re Masters* noted that its determination was "guided by the principles of traditional *trust* law." *Chemung*, 939 F.2d at 16 (emphasis added); *see In re Masters*, 957 F.2d at 1027. The present case is distinguishable from *Chemung* and *In re Masters* because, among other things, this court's determination about whether to recognize

contribution rights under the ATA is guided by traditional principles of *tort* law. In contrast to the "the right of contribution ... [that] has been for over a century, and remains, an integral and universally-recognized part of trust doctrine," *Chemung*, 939 F.2d at 16, traditional principles of tort law do not recognize a right of contribution on behalf of intentional tortfeasors. *See* Discussion *supra* Part I.A.ii.

expressly or by clear implication, its intent to create a contribution claim on behalf of those accused of intentionally violating the ATA. The court has no power to create a common law contribution claim under the ATA, and even if it did, the court would decline to create such a claim.

## II. Whether There Is a Right of Contribution Under the ATS

■ The ATS provides in its entirety that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Arab Bank argues that, since the Supreme Court in *Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), found the ATS to be jurisdictional in nature, and that the contours of the tort claims brought under it would be determined by the courts, federal courts can imply rights of contribution. While I agree that the issue of contribution under the ATS is a matter of federal common law, reference to the statute is proper. Although the ATS is a jurisdictional statute, it provides jurisdiction only over particular types of claims identified in the statute, namely, claims defined by the law of nations and recognized at common law. *Almog*, 471 F.Supp.2d at 270, *quoting Sosa*, 542 U.S. at 712, 124 S.Ct. 2739. Nothing in the statute explicitly creates a right of contribution on behalf of defendants accused of violating the law of nations. Nor is there any sound reason, such as that involved in *Musick*, discussed above, to imply a right of contribution under the ATS.

■ In determining whether to create a federal common law right of contribution under the ATS, the issue is first whether the rule of decision should be international law (which provides the rule of decision in

determining whether a plaintiff can state a claim under the ATS) or domestic federal law. Either way, I find no basis for the judicial creation of a federal law of contribution under the ATS. As essentially undisputed, no international law norm provides those who violate international law with a right to seek contribution against a third party. Nor is there any sound reason to judicially craft such a right onto the ATS. As the Supreme Court discussed at length in *Sosa*, only a very limited number of claims defined by the law of nations are properly treated as part of our common law for purposes of suit by aliens under the ATS. *See Sosa*, 542 U.S. at 712, 720, 724, 731–34, 124 S.Ct. 2739; *see Almog*, 471 F.Supp.2d at 269–274. And this court is mindful of *Sosa*'s direction that district courts, in applying the ATS, "tread lightly in exercising their discretion because courts generally have to look for 'legislative guidance before exercising innovative authority over substantive law' and because the 'decision to create a private right of action is one better left to legislative judgment in the great majority of cases.'" *Almog*, 471 F.Supp.2d at 273, *quoting Sosa*, 542 U.S. at 726–27, 124 S.Ct. 2739. Taking these comments in conjunction with the body of federal law that governs the creation of contribution rights under other federal statutes, addressed above with respect to the ATA, supports rejection of a right of contribution under the ATS.

Far from being a right of action that States universally recognize, as that is described in *Sosa*, contribution rights on behalf of intentional wrongdoers are not even universally recognized within the United States. Indeed, given the particularly egregious nature of any conduct recognizable as a violation of the law of nations, the oft-expressed principle that intentional tortfeasors traditionally are not entitled to seek contribution from others has special resonance in an ATS case. *See, e.g., Texas*

*Industries,* 451 U.S. at 635, 101 S.Ct. 2061 (noting that culpable parties who attempt to draw upon equitable principles to mitigate the consequences of their own wrongdoing are traditionally viewed with disfavor); *see also Musick,* 508 U.S. at 297, 113 S.Ct. 2085 ("The course of tort law in this century has been to reverse the old rule against contribution, but this movement has been confined in large part to actions in negligence").

There exists no universally accepted rule, either domestic or international, that allows a defendant accused of intentional misconduct to seek damages from others who allegedly contributed to that misconduct, In sum, there exists no authority to support recognizing Arab Bank's contribution claim under the ATS.

### CONCLUSION

The third party defendants' motions to dismiss the third party complaints are granted. Plaintiffs' motion to strike the third party complaints is dismissed as moot.

**SO ORDERED.**